Glendyl Ray Hendricks and Estate of Marian H. Hendricks, Deceased, Glendyl Ray Hendricks, Executor v. Commissioner.
Hendricks v. Commissioner
Docket No. 67375. 959.
United States Tax Court
T.C. Memo 1959-195; 1959 Tax Ct. Memo LEXIS 55; 18 T.C.M. (CCH) 876; T.C.M. (RIA) 59195; October 20, 1959
A. Calder Mackay, Esq., 523 W. 6th Street, Los Angeles, Calif., and Charles J. Higson, Esq., for the petitioners. Eugene F. Reardon, Esq., Leo K. O'Brien, Esq., and R. E. Maiden, Jr., Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in the income tax of Marian H. Hendricks and Glendyl Ray Hendricks for the calendar year 1953 in the amount of $275.44. The sole issue is whether during 1953 petitioner Glendyl Ray Hendricks was "away from home" within the meaning of sections 22(n)(2) and 23(a)(1)(A) of the Internal Revenue Code of 1939, [1] while performing services at Edwards Air Force Base, California. *56 Findings of Fact All of the stipulated facts are so found. Petitioner Glendyl Ray Hendricks and Marian H. Hendricks were husband and wife during 1953, and filed a joint income tax return for the calendar year 1953 on the cash basis with the director of internal revenue at Los Angeles, California. Marian H. Hendricks died June 5, 1956, and Glendyl Ray Hendricks was appointed executor of her estate, in which capacity he has duly acted as well as in his individual capacity, in the prosecution of this proceeding. The estate is a party hereto solely because Marian H. Hendricks joined in the filing of a joint return for 1953, and Glendyl Ray Hendricks will hereinafter be referred to as the petitioner. Douglas Aircraft Company is a manufacturer of aircraft and other airborne articles. It produces aircraft and air materials for various divisions of the Department of Defense of the United States under contracts with the Government, as well as for private, commercial concerns. It carries on its manufacturing operations in California at three plants. They are located in Santa Monica, El Segundo, and Long Beach. Santa Monica and El Segundo are within the metropolitan area of Los Angeles. *57 Santa Monica is 8 miles from El Segundo, and El Segundo is 18 miles from Long Beach. Douglas Aircraft also has a manufacturing plant in Tulsa, Oklahoma. The over-all operations of Douglas Aircraft are carried on in several divisions such as research, designing, manufacturing, and testing. The headquarters of the Testing Division is at the Santa Monica plant. It has jurisdiction over various kinds of testing, including flight testing, of prototypes of aircraft in preparation for their manufacture. The United States Air Force for many years has maintained a base in the Mojave Desert in California, 117 miles from Santa Monica and 124 miles from El Segundo, which is known as the Edwards Air Force Base. The towns which are closest to Edwards Base are Lancaster, 31 miles away, and Palmdale, 41 miles distant. The population of Lancaster in 1953 was 10,500. Edwards Base is located on the edge of a dry lake area 12 miles long and 4 miles wide. The location always has provided a superior location for experimental and high speed flight tests because of the condition of the terrain, the claimate, and its remoteness from populated areas. Both the United States Air Force and the Navy required *58 in some contracts with Douglas Aircraft that flight tests of new and experimental aircraft would be made at certain military bases, including Edwards Base. Although all of the facilities at Edwards Base are owned by the United States, certain test, hangar, and support facilities located there were and are made available to several aircraft manufacturing concerns such as Douglas Aircraft, Lockheed, Convair, Boeing, North American, Northrop, and McDonald. Douglas Aircraft has made flights and other tests at Edwards Base from 1947 up to the present time, during which period facilities at Edwards were made available to Douglas. Since 1947, the facilities at Edwards which have been made available to Douglas Aircraft have increased. At various times, Douglas has made additions to such facilities at its own expense. Prior to 1953 a master plan was drawn by the Air Force, the Navy, and others for the enlargement and modernization of Edwards Base and the construction of a new and longer runway. Such improvements were planned because of the rapid growth of and new developments in the aircraft industry, the development of planes capable of flying at supersonic speeds, and the expected increase *59 in the use of the base by the Air Force, the Navy, and various contractors. Douglas had long felt its assigned facilities at Edwards were inadequate and from 1950 forward had engaged in an extensive search for a better location. By late 1953 conditions were such that Douglas doubted its ability to continue to operate at Edwards. In 1954 an agreement was finally reached between Douglas, the Government and another contractor to create a joint facility for both contractors convenient to the new runway. This was approved in the latter part of 1954, and Douglas moved into the facility early in 1956. During 1952, 1953, and before, the aircraft tests made by Douglas at Edwards Base were for the most part connected with its contracts with a military department of the Government. Only in rare instances did Douglas make tests at Edwards Base of aircraft produced for commercial concerns. Of the total experimental aircraft which the Testing Division of Douglas flight tested during 1953, one-fifth was tested at Edwards Base, and such flight tests were made under contracts with both the Air Force and the Navy. In general, the work to be done by Douglas under the specifications of a contract *60 with an agency of the Government was laid out in accordance with a plan and the time required for each stage of the work was estimated but it was not possible, always, to adhere to such estimates, and they were subject to revisions. Also, the occurrence of accidents, failures, crashes, and unforeseen events, if such happened, would alter the planned work schedules. Usually the duration of a testing operation to be done at Edwards Base by Douglas was estimated in advance. The length of time required for flight testing at Edwards has been either a few months, or as long as 1 year, 1 1/2 years, or 2 years. There were instances when an employee was sent from Santa Monica to Edwards Base that it was expected that the employee would be at Edwards longer than 3 months. It is customary in the Testing Division to organize the work on the basis of a project, and under this system various classes of employees are assigned to a project so that they become thoroughly familiar with it from the beginning to the end. In 1953, Douglas kept a few employees, such as foremen and tool keepers, at Edwards Base continuously. These workers were not assigned to any particular project, and they did general *61 work. During 1953, about 120 employees of the Testing Division were engaged in work at Edwards Base under project assignments. It was the policy of Douglas Aircraft in 1952, 1953, and around that time to pay all of its employees in its Testing Division who worked at Edwards Base (excepting persons who were hired from a place in the locality of the Base) $7 per day, in addition to their regular salaries, during the entire period such employees worked at the Base. The $7 per day allowance was called a "per diem" and was paid under a so-called travel order, form 29-179, and a printed form, form 29-BA, which is called a travel expense form, which is filled out by the employee. Douglas did not withhold any income tax on the allowances of $7 per day. In general, under contracts with the Air Force and the Navy, the Government reimbursed Douglas for its expenses. In adopting its policy of paying a per diem of $7 per day to its employees during the period they worked at Edwards Base, Douglas had various discussions with the contracting officers and auditors of the Air Force and the Navy about the propriety, under the Armed Services Procurement Regulations, of putting the employees who *62 worked at Edwards on travel status during such assignments, of paying them $7 per day, and of including that expense in the expenses of Douglas for which Douglas was reimbursed by the Government. Regulation 15 of ASPR refers to the reimbursement by the Government of reasonable travel expenses. The Air Force and the Navy accepted the policy of Douglas with respect to the payment of a per diem to its employees working at Edwards Base, and all such per diem expenses have been entered in the books of Douglas as employees' travel expenses, have been included in the charges of Douglas for its expenses, and have been reimbursed as travel expenses by the Air Force and the Navy. Douglas Aircraft's policies and procedures relating to travel of employees are set forth in the company's Travel Manual and in executive bulletins. Among the policies and procedures which were in effect in 1952 and 1953 was a policy relating to employees working on testing projects at test centers away from Santa Monica. In the statement of that particular policy it is said that testing be done at test centers located away from Santa Monica; that such contracts specifically include per diem and travel expense as a *63 reasonable and necessary cost item approved by the Air Force and Navy Procurement agencies; that employees who are transferred to a test center are transported at company expense and paid a per diem rate; that employees are assigned to a test center by means of a travel order, form 29-179, which specifies inter alia the amount of the per diem rate; that such travel orders "are never written for periods in excess of 90 days"; that the travel orders are reviewed by the company every 90 days; that although the initial travel order cannot authorize travel status and the payment of a per diem rate for longer than 90 days (3 months), it can be extended under a supplemental travel order for an additional 90 days; that specific policies and procedures are established to govern per diem rates and other conditions of assignments to Edwards Air Force Base, White Sands Proving Ground, and Point Mugu; that Edwards Air Force Base, White Sands Proving Ground, and Point Mugu had an established per diem rate of $7; and that in the case of assignments to Point Mugu and extended assignments to Edwards Air Force Base, special arrangements had been established for the extension of travel orders. Under *64 Douglas Aircraft's policy described above, Douglas classified, in 1952 and 1953, assignments of employees to Edwards Base (and to other test centers) as a "temporary assignment" regardless of the length of time it was expected the employee would work there and of the number of work extensions which were made of an initial 90-day order, so that if an employee worked continuously at Edwards Base for 1 or for 2 years the assignment continued to be classified as temporary. However, according to the Travel Manual, in 1955 Douglas Aircraft designated Edwards Base as a "permanent location," Location A8, and thereafter those employees who, because of their respective jobs, could be expected to remain at Edwards "for an indefinite period" were regarded as permanently assigned to Edwards Base, they were not classified as being on "travel status," and they did not receive any per diem payments. Under the policy of Douglas set forth above, in instances where it was known at the time of making assignment of an employee to Edwards Base that he would be there for more than 3 months, his assignment was made for only 3 months under a travel order with the understanding that the travel order would *65 be extended. The assignment of an employee to Edwards Base under a 3 months' travel order did not necessarily mean that the employee's assignment to the Base would be limited to 3 months. For as long as an employee of Douglas remained at Edwards, he was assigned there under a 90-day travel order, or a supplemental order or orders. The use of the 90-day travel orders by Douglas as the means of assigning employees to Edwards Base, the review thereof at the end of 90 days, and the extensions of initial travel orders by supplemental orders served administrative and accounting purposes, and in many instances represented a management control device. In those instances where an employee who had been assigned to Edwards Base moved his family to a town near the Base and rented or purchased a family home there, such employee continued to be assigned to the Base under a 90-day travel order, his order remained outstanding, and he continued to receive a $7 per diem allowance. Douglas Aircraft knew that some of its employees who worked at Edwards Base moved their family residences to Lancaster or Palmdale and that some purchased homes there, but nevertheless the travel orders and payments *66 of the per diem allowance were continued. However, Douglas did not pay such employees' moving expenses. Petitioner was continuously employed by Douglas from June 13, 1939, to March 20, 1953. He was first engaged as a productionline electrician, but sometime, approximately during the year 1943, was transferred to the electrical maintenance department. He also attended classes at the University of Southern California beginning in 1945, and received a degree in 1949 in electrical engineering. All of his work was at the Santa Monica plant during the foregoing 10-year period. Petitioner then canvassed the various plant sections at Douglas with respect to engineering positions. Upon learning that engineers were then being released rather than hired, he transferred to the Testing Division at Santa Monica in the latter part of 1949 as an electrician. He accepted the condition that he could be expected to travel at any time. In February of 1950 petitioner was sent to El Segundo in connection with the test project of the "XA-2D," an experimental plane of radical design. The project, along with the test crew, including petitioner, went to Edwards approximately May 20, 1950. In December *67 of 1950 the plane crashed, killing the Navy pilot, and the project returned to Santa Monica. A number of trips back to Santa Monica had also been made between May and December for additional work. The test crew of the "XA-2D" remained at Santa Monica until September 18, 1951, while a second ship of the same series was readied for testing. On the latter date the project again went to Edwards. Everything at first seemed in order, and the tests were expected to be completed in a short time. Unforeseen difficulties arose, however, requiring 18 engine changes between September and December, and no flights could be made. In mid December the plane had to be returned to El Segundo because of a gear box failure, at which time petitioner returned to Santa Monica. In February or March of 1952, petitioner again went to Edwards with the "XA-2D" project, remaining there until August of that year, when he returned to Santa Monica. On March 20, 1953, he left the employ of Douglas for various personal reasons, but primarily because of dissatisfaction on the part of himself and his wife with the amount of travel required in his work for Douglas. Petitioner's family had resided in Santa Monica *68 continuously during his employment by Douglas. He had first purchased a home in that area in 1941, and in 1948 disposed of it while acquiring a larger home. His family continued to reside in the latter home while he was at Douglas during the foregoing periods, although they occasionally stayed with him in Navy housing at Mojave, near Edwards. Petitioner took a position with another aircraft firm when he left Douglas, and was assigned to a plant in Pomona, California. Petitioner moved his family to Pomona, rented a house, and made a down payment on land in the area, renting the Santa Monica house to a personal friend. Thereafter, petitioner found his work unsatisfactory, and he and his wife found the Pomona area less desirable than they had anticipated. As a result, petitioner left his new employment after less than 2 months and was rehired in the Testing Division of Douglas on or about May 15, 1953. Prior to leaving Douglas, petitioner's work locations in 1953 had been as follows: Dates
Location
January 1 to January 20
Santa Monica
January 20 to February 4
Edwards
February 4 to March 20
Santa Monica
Upon reemployment by Douglas, petitioner worked at Santa *69 Monica until June 25, 1953. He was then assigned to Edwards in connection with two projects, the "XF-4D" and the "A2D." The latter was substantially a continuation of the "XA-2D" project. Petitioner remained at Edwards for the remainder of 1953. In May 1954, petitioner was reassigned from the "XF-4D" project to the first production of the plane tested thereunder. In August 1954, he was assigned to the setting up of a weapons system laboratory in connection with the "RB-66A" Air Force reconnaissance bomber. Both of these assignments were apparently at Edwards. When petitioner was reemployed by Douglas, his family remained in Pomona until the end of the school year. They then joined petitioner, living in a rented apartment in Lancaster, where they remained until approximately August of the same year. On or about July 28, 1953, petitioner purchased a home in Lancaster, in which he and his family have continued to reside to the date of the hearing herein. The house in Santa Monica was continuously rented, until it was sold in June of 1958 to the then current tenants. When petitioner was assigned to Edwards in June of 1953 he had no reason to expect, and did not expect, that such *70 assignment was in any way different from his previous tours of duty there. Petitioner's expenses for travel, meals and lodging while at Edwards during 1953 were in the stipulated amount of $1,244.12. Opinion Respondent has stipulated that if petitioner was away from home while employed at Edwards during 1953, then his away-from-home expenses at Edwards, under section 22(n)(2), totaled $1,244.12. There are no substantial factual differences between this case and John J. Harvey, 32 T.C. - (September 30, 1959). We therefore hold, on the authority of that case, that petitioner's employment at Edwards during 1953 was indefinite rather than temporary since it could not be foreseen that termination would occur within a fixed or reasonably short period; therefore, the expenses of $1,244.12 were nondeductible personal and living expenses. Decision will be entered for the respondent. Footnotes
1. SEC. 22. GROSS INCOME. * * *
(n) Definition of "Adjusted Gross Income". - As used in this chapter the term "adjusted gross income" means the gross income minus - * * *
(2) Expenses of Travel and Lodging in Connection with Employment. - The deductions allowed by section 23 which consist of expenses of travel, meals, and lodging while away from home, paid or incurred by the taxpayer in connection with the performance by him of services as an employee; * * * SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for * * *; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *↩